UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal Action No. 1:23-cr-10130-IT |
| | * | |
| LITANG LIANG, | * | |
| | * | |
| Defendant. | * | |

MEMORANDUM & ORDER

July 16, 2024

TALWANI, D.J.

Defendant Litang Liang is charged with acting as an agent of a foreign government without notice to the Attorney General, in violation of 18 U.S.C. § 951, and conspiracy to act as an agent of a foreign government without prior notification, in violation of 18 U.S.C. § 371. The Indictment alleges that between July 2018 through at least 2022, Liang acted under the control or direction of officials of the People's Republic of China ("PRC") without notifying the Attorney General of his status as an agent of a foreign government. Liang challenges the Indictment against him on both sufficiency and constitutional grounds. Def. Mot. to Dismiss [Doc. No. 58]. For the reasons set forth herein, Liang's Motion is DENIED.

I. **Facts as Alleged in the Indictment**

    A. *Liang Provides Information Regarding Boston Individuals and Organizations to PRC Officials*

In July 2018, Liang reported to a PRC official ("PRC Official 1") that someone had destroyed PRC flags in the Boston neighborhood of Chinatown. Indictment ¶ 4(a) [Doc. No. 1]. Liang provided PRC Official 1 with the name of the individual he believed to be responsible for the destruction. Id.

In or around August 2018, Liang informed an associate that the PRC Consulate in New York wanted to know about the "political standing" of a local lawyer, and asked if the associate knew the lawyer. Id. ¶ 4(b). Liang also informed the same associate that the "Consulate" was coming to Boston and asked if the associate wanted to meet with the Consulate to discuss the "blacklist." Id. ¶ 4(c). Liang also informed the associate that PRC Official 1 wanted "something done" about the removal of the PRC flags. Id. Approximately six days later, the associate sent Liang an email titled "Black Name List." Id.

In or around September 2018, Liang helped to organize an event that was attended by PRC Official 1 and a high-ranking official at the PRC Consulate of New York ("PRC Official 2"). Id. ¶ 4(d). A few days later, PRC Official 1 asked Liang for the name of an individual who had attended the event and who worked for a Boston elected official. Id. Liang provided PRC Official 1 the name and title of the individual. Id.

On or about October 5, 2018, Liang shared photographs and videos with PRC Official 2 of the individual he claimed had "sabotaged" the PRC flags in July. Id. ¶ 4(e). Liang claimed to have held a press conference to denounce the individual. Id. Three days later, Liang shared an article with PRC Official 2 that accused a member of a local Chinese community organization with pro-Taiwan leanings of being the person who "sabotaged" the PRC flags. Id.

On or about December 6, 2018, PRC Official 1 requested from Liang how many individuals worked for the pro-Taiwan community organization. Id. ¶ 4(f). Later that day, Liang and PRC Official 1 had a 15-minute phone conversation. Id.

On or about February 10, 2019, Liang and PRC Official 1 had an approximately 12-minute phone conversation. Id. ¶ 4(g). Several days later, Liang sent PRC Official 1 a list of members of another pro-Taiwan community organization. Id.

On or about February 21–22, 2019, Liang sent PRC Official 1 information about three other local Chinese family associations in New England and New York, including the size of each group's memberships and the names of some group leaders. Id. ¶ 4(h).

B.   *Liang's 2018 Travels to the PRC to Attend a Conference and Meet with Government Officials*

In or around October 2018, PRC Official 1 connected Liang with another PRC government official ("PRC Official 3"), the director of a subsidiary entity of the United Front Work Department. Id. ¶ 5. The subsidiary entity's goal was to promote the unification of Taiwan with the PRC, which is a core PRC national security goal. Id. ¶ 5 n.2. PRC Official 3 sent information to Liang regarding the subsidiary entity, including a form to attend a conference for the organization in the PRC. Id. ¶ 6. Liang returned the completed form. Id. During this time, Liang also communicated with PRC Official 4, who asked Liang to supply the names of the other individuals who would be attending the conference as well as the most influential organizations who would be traveling with Liang. Id. ¶ 7.

Liang traveled to the PRC twice over the next few weeks: once from October 23–27, 2018, and again from November 4–15, 2018. Id. ¶ 6. On October 24, 2018, while Liang was in the PRC, PRC Official 4 asked Liang to provide information on Chinese nationals living in the Boston area and further information on the pro-Taiwan community organization in Boston. Id. ¶ 7. Liang informed PRC Official 4 that he had communicated his request to another individual, who would contact PRC Official 4 directly. Id.

On November 2, 2018, Liang sent PRC Official 3 a message expressing regret that they had been unable to meet during Liang's October visit and providing details about Liang's November visit itinerary, including meetings with the United Front Work Department and the

3

Taiwan Affairs Office of the State Council, a PRC government agency that promotes the unification of Taiwan with the PRC. Id. ¶ 6.

      C.    *Liang Coordinates with PRC Officials to Establish the New England Alliance for a Peaceful Reunification of China*

In or around December 2018, Liang communicated with another government official ("PRC Official 5") who worked as part of the Taiwan Affairs Office of the State Council at the Consulate in New York. Id. ¶ 8. Later that same month, PRC Official 5 traveled to Boston with other Consulate members, including PRC Official 2, and met with Liang and others. Id. On or about December 20, 2018, Liang informed PRC Official 2 that the work for setting up a new reunification organization was ready and the "core team" had been identified. Id. ¶ 9.

In or around January 2019, Liang co-founded the New England Alliance for the Peaceful Reunification of China ("NEAPUC") and subsequently served as its Vice President. Id. ¶ 10. A similar organization had previously existed in Boston ("the Boston Group") and two individuals associated with the Boston Group ("Boston Group Individual A" and "Boston Group Individual B") had left the United States for the PRC and not returned at the time of their involvement in events described below. Id. ¶ 14 n. 6–7.

On or about April 18, 2019, Liang sent a WeChat message to the leader of another reunification organization in the United States ("Individual 4") informing the individual that NEAPUC consisted of chairmen of local community organizations and had high standards for accepting new members. Id. ¶ 11. Liang informed the individual that he would rather discuss details over the phone. Id.

On or about April 22, 2019, Liang sent NEAPUC's logo to PRC Official 1 and sent the logo as well as the incorporation documents to PRC Official 5. Id. Liang also informed PRC

Official 5 that NEAPUC had developed a "core team" from local organizations, that it had strict membership requirements, and that Liang could provide more details over the phone. Id.

      D.     *Liang Coordinates a Counter-Protest to the "Boston Stands with Hong Kong" Rally*

In August 2019, individuals around the world organized rallies to support anti-extradition protestors in Hong Kong. Id. ¶ 13. In Boston, supporters of the protestors organized a "Boston Stands with Hong Kong" march from the Massachusetts State House to Chinatown on August 18, 2019. Id.

           1.     Liang's Actions Preceding the Boston Rally

At 11:48 a.m. on August 17, 2019, PRC Official 5 sent Liang a link to a Facebook page that discussed worldwide rallies taking place between August 16–18, 2019, in support of the pro-democracy, anti-extradition movement in Hong Kong. Id. ¶ 14(a). One minute later, Liang sent the same link to the NEAPUC President. Id. ¶ 14(b). Several hours later, Liang sent the link to three other members of NEAPUC. Id. ¶ 14(c). At approximately 10:03 p.m. that day, Liang attempted to call PRC Official 5 but did not connect. Id. ¶ 14(d). At approximately 10:29 p.m. on August 17, 2019, Individual 4 sent Liang a post made by the Boston Group on a local Boston WeChat group. Id. ¶ 14(e). At approximately 10:32 p.m., Individual 4 informed Liang that the post was a screenshot of a WeChat message that Boston Group Individual A sent about the next day's gathering. Id. Individual 4 told Liang it would be very helpful if NEAPUC could support it, and Liang responded that he would definitely provide support. Id.

At approximately 10:49 p.m., Liang sent two voice memos to PRC Official 5. Id. ¶ 14(f). At approximately 10:55 p.m., Liang sent videos to PRC Official 5 regarding a Hong Kong counter-protest Liang and Individual 5 had attended earlier that day in New York. Id. ¶ 14(g). At

approximately 11:09 p.m., PRC Official 5 called Liang and they spoke for approximately ten minutes. Id. ¶ 14(h).

Between about 11:35 p.m. and 11:42 p.m., Liang sent several messages and videos of the day's Hong Kong pro-democracy protests in New York to members of the Boston Group. Id. ¶ 14(i). Boston Group Individual B sent Liang information on an upcoming counter-protest from the PRC. Id. ¶ 14(j). Liang responded with a screenshot of an itinerary for the counter-protest. Id. Individual B then told Liang that plans had changed. Id.

At approximately 12:20 a.m. on August 18, 2019, Liang sent a message to four members of NEAPUC, stating: "'Hong Kong independence' activists will gather near the State House tomorrow (18th) at 2pm. Hope everyone can notify your friends and family to take some time and gather at the same place, and denounce the 'Hong Kong independence activists' together. Thank you!" Id. ¶ 14(k).

At or about 1:11 a.m., Liang asked PRC Official 1 to notify members of a local Chinese community organization to gather in front of the State House to condemn the Hong Kong independence activists. Id. ¶ 14(l). Liang stated that he would not have time to arrange the flags, but that he believed one of the community organizations would have flags available for the event. Id.

At or about 7:47 a.m., PRC Official 1 responded "thank you for your hard work!" and told Liang that "for matters related to [one of the organizations]," Liang should speak to them directly, because "it is not very appropriate for me to talk to them… [T]his kind of thing should be mostly voluntary. It would probably put some pressure on them if I talk. But you can tell them 'I heard from [PRC Official 1] that you may still have some small flags.' This way, they will

6

probably know I am aware of this matter. Then, however they want to handle it specifically will be up to them, voluntarily." Id.

        2.        Liang's Actions During the Boston Rally on August 18, 2019

At or about 2:00 p.m., around the start of the Boston Stands with Hong Kong Rally, a large number of counter-protestors arrived and chanted pro-PRC slogans. Id. ¶ 15. Liang passed out a large PRC flag to the counter-protestors. Id. During the Rally, Liang took numerous photos and videos of both counter-protestors and the anti-extradition, pro-democracy "dissidents." Id. ¶ 16.

Between approximately 3:27 p.m. and 3:34 p.m., Liang exchanged four phone calls with PRC Official 2, lasting a total of approximately seven minutes. Id. ¶ 17. At approximately 3:43 p.m., Liang called PRC Official 1 and they spoke for approximately three minutes. Id. ¶ 18.

        3.        Liang's Actions After the Boston Rally

After the Rally, in the evening of August 19, 2019, Liang and PRC Official 1 spoke on the phone for approximately eight minutes. Id. ¶ 19. Liang also sent photos and videos of the counter-protestors to PRC Official 1 and PRC Official 5. Id.

Liang also sent a message to Boston Group Individuals A and B informing them that his organization had provided the Chinese flag, bragging about the success of the counter-protest, and claiming that his organization had done a better job than others. Id. ¶ 20. Liang also sent messages to Individual B asking if Individual B was afraid that Liang would "steal[] his prestige," and suggesting that if Individual B did not change his behavior he eventually would be "cast[] aside." Id.

On or about August 19, 2019, Liang sent a message to PRC Official 6, who was at the time one of the highest-ranking PRC diplomats in the United States. Id. ¶ 21. The message

7

included a video of the Boston Stands with Hong Kong Rally, showing one of the pro-democracy dissidents. Id. Liang told PRC Official 6 that "[t]he guy holding the microphone ([Individual 6]) is the rascal who damaged the national flags last year. He was berated by the crowd yesterday!" Id.

Also on or about August 19, 2019, Liang exchanged messages with a professor from Jinan University (a university that is overseen by two PRC government agencies) who was a visiting academic at a university in Boston. Id. ¶ 22. Liang informed the professor that Liang had been tasked with building the counter-protest in Boston and that he had been responsible for making the counter-protest happen. Id. Liang told the professor that "[b]y doing this type of job, you must be super careful about what to do and what to say in public, especially on those sensitive topics." Id.

On September 2, 2019, Liang photographed anti-PRC dissidents in front of the Boston Public Library and sent the photos to PRC Official 1, stating that the dissidents were "trying to cause trouble." Id. ¶ 23.

E.   *Liang's 2019 Visit to the PRC*

On or about September 4, 2019, PRC Official 1 invited Liang to an event in the PRC from September 27 to October 2, 2019, for a celebration of the 70th anniversary of the establishment of the PRC. Id. ¶ 24. Liang left the United States on or about September 21, 2019, and returned on or about October 2, 2019. Id. ¶ 25. While in the PRC, Liang attended events hosted by the United Front Work Department and other PRC agencies, including a conference, a reception, and a military parade. Id. On September 26, 2019, Liang informed PRC Official 5 that the peaceful reunification conference Liang had attended had been "very successful," that he had "learned a lot," and that it would inform the "direction of work." Id. ¶ 26.

      F.     *Liang Provides Updates on NEAPUC to PRC Officials*

In or around November 2019, Liang sent a summary of NEAPUC's work in 2019 to PRC Official 3 (the "2019 Work Summary") detailing the activities set forth above. Id. ¶ 27. On or about December 13, 2019, Liang sent the 2019 Work Summary to PRC Official 5. Id. ¶ 28.

      G.     *Liang Exchanges Information with PRC Officials Regarding Chairmen of Local Organizations*

In or around November and December 2019, Liang sent PRC Official 1 updates regarding the election for Chairman of one of the local Chinese community organizations. Id. ¶ 29. In early December, Liang informed PRC Official 1 that a pro-Taiwan individual was attempting to get the Chairman "on their side" and that Liang and the official would need to "win this secret battle." Id. In January 2020, Liang informed PRC Official 1 that the Chairman was "leaning toward their side." Id. Liang also said that he had encouraged the Chairman to take a trip to China and to invite the PRC consular officials to a New Year's banquet. Id.

On or about July 11, 2022, Liang and PRC Official 7 had a call of approximately 18 minutes. Id. ¶ 31. The next day, July 12, 2022, the two had another phone call of approximately ten minutes. Id. Later that same day, PRC Official 7 asked Liang to provide him with information on two "vice presidents" within the overseas Chinese community and told Liang that he would provide for Liang and the two "vice presidents" to tour the Chinese Embassy. Id. Liang then sent PRC Official 7 the names of two individuals: the Chairman of Organization H and the Vice Chairman of Organization I. Id. ¶ 32. Liang informed PRC Official 7 that the individuals were young, capable, and the best candidates for PRC Official 7 to cultivate and train. Id. PRC Official 7 confirmed he had received the information. Id. Shortly thereafter, Liang visited the Chinese Embassy with the two individuals. Id. ¶ 33.

**II.     Standard of Review**

An indictment must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). This rule derives from the Fifth Amendment's guarantee that a defendant be first indicted by a grand jury before being held to answer for a criminal charge and the Sixth Amendment's guarantee that the accused "be informed of the nature and cause of the accusation." United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (citing U.S. Const. Amends. V and VI).

"An indictment need not say much to satisfy [Rule 7(c)(1)'s] requirements—it need only outline 'the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.'" Id. (citing United States v. Guerrier, 669 F.3d 1, 3 (1st Cir. 2011)). An indictment is generally sufficient if it "tracks the language of the underlying statute" provided "that the excerpted statutory language sets out all of the elements of the offense without material uncertainty." United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010). "In other words, the statutory language may be used in the indictment to describe the offense, 'but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" Troy, 618 F.3d at 34 (quoting Hamling v. United States, 418 U.S. 87, 117–18 (1974) (internal citations omitted)).

Furthermore, a motion to dismiss must only "attack the facial validity of the indictment . . . [rather than] challeng[ing] the government's substantive case." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015). As a result, the court must "take the facts alleged in the indictment as true, mindful that the question is not whether the government has presented enough evidence

to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." Id. (internal quotations omitted).

### III. Discussion

#### A. *Intent Required for the Conspiracy Charge*

Liang is charged with violating both 18 U.S.C. § 951, which makes it a crime for an individual "other than a diplomatic or consular officer or attaché" to "act[] in the United States as an agent of a foreign government without prior notification to the Attorney General," and 18 U.S.C. § 371, which prohibits entering into a conspiracy to act as an agent of a foreign government without prior notification to the Attorney General. Liang argues the conspiracy count should be dismissed because the indictment does not sufficiently allege that he had the "explicit, agreed upon intention of [acting as an agent] without notifying the Attorney General." Def. Mem. ISO Mot. to Dismiss 7 [Doc. No. 59]. Liang contends that "the intent the government must prove [in the conspiracy charge] is the intent to violate the notification requirement." Id. at 8.[1] But a conspiracy charge cannot require a higher mens rea than the underlying offense, United States v. Feola, 420 U.S. 671, 686–87 (1975), and Liang does not dispute that Section 951 itself (the underlying offense in question) carries no specific intent with respect to the notification requirement. See, e.g., U.S. v. Duran, 596 F.3d 1283, 1292 (11th Cir. 2010) ("[K]nowledge of the notification requirement need not be proven by the government."); U.S. v. Dumiesi, 424 F.3d 566, 581 (7th Cir. 2005).[2]

---

[1] Liang claims he is not making an ignorance of law argument, but at the same time posits that "one cannot conspire to violate a requirement if one does not know of its existence." Def. Mem. ISO Mot. to Dismiss 8 [Doc. No. 59]. To the extent Liang's argument turns on the fact that he did not know he was required to notify the Attorney General, that argument fails. See Cheek v. United States, 498 U.S. 192, 199 (1991).

[2] At oral argument, the government suggested that Section 951 is a strict liability offense that would penalize even a defendant who had attempted to notify the Attorney General, but whose

11

The government is not required to demonstrate the heightened mens rea Liang requests—that Liang had the specific intent to act without notifying the Attorney General—as to the underlying crime. Consequently, the government is also not required to prove that Liang engaged in a conspiracy to act with the intent to violate the notification requirement.

B.    *Section 951's Definition of "Agent"*

1.    Whether Section 951's Definition of "Agent" Is Unconstitutionally Vague

Liang argues that Section 951 fails to clearly define the term "agent," which renders the statute unconstitutionally vague. "Void for vagueness . . . means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." United States v. Nat'l Dairy Products Corp., 372 U.S. 29, 32–33 (1963). The court applies a two-part test to determine whether a statute is impermissibly vague, asking whether the statute defines a criminal offense with (1) "sufficient definiteness that ordinary people can understand what conduct is prohibited," and (2) "in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983). "[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." Nat'l Dairy Prods. Corp., 372 U.S. at 32. Additionally, there is a strong presumption in favor of the statute's constitutionality. Liang contends that the statute's definition of "agent" fails both parts of the test. Def. Mem. ISO Mot. to Dismiss 18 [Doc. No. 59]. The court disagrees.

---

notification had not been successful. The court rejects that interpretation of the statute. See Elonis v. United States, 575 U.S. 723, 735 (2015) ("[A] defendant generally must 'know the facts that make his conduct fit the definition of the offense,' even if he does not know that those facts give rise to a crime.") (citation omitted).

First, Section 951 sufficiently defines the proscribed conduct on its face. Section 951(d) defines "agent" as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government." Liang argues that this definition is so broad as to potentially penalize any person "who communicates with embassies on a regular basis." Def. Mem. ISO Mot. to Dismiss 19 [Doc. No. 59]. But that is plainly not true. A person is not considered an "agent" under the statute when he is merely "communicating," but only when the individual "agrees to operate . . . subject to the direction or control" of a foreign government. 18 U.S.C. § 951(d). Communications with a foreign embassy, standing alone, do not satisfy the statutory definition.

Second, Section 951's definition of "agent" does not invite arbitrary enforcement. Liang's argument on this point is largely based on his interpretation of the Foreign Agent Registration Act ("FARA"), 22 U.S.C.A. §§ 611 et seq., which is a related—but distinct—statute from the one at issue in this case. FARA's definition of "agent" is much broader than Section 951's definition of "agent," compare 22 U.S.C.A. § 611(c) with 18 U.S.C. § 951(d), and embodies a "concept of agency that [includes] less formally defined (and more episodic) behavior [undertaken] 'in any other capacity' at the 'order' [or] 'request'" of a foreign principal, rather than actions undertaken only "under the direction or control" of a foreign government. See The Scope of Agency Under FARA, available at https://www.justice.gov/nsd-fara/page/file/1279836/dl#:~:text=The%20ultimate%20test%20for%20agency,.%E2%80%9D%20Heymann%20Testimony%20at%20701. (U.S. Dep't of Justice, May 2020). Because Section 951 expressly defines "agent" in narrower terms, Liang's FARA-specific arguments are not persuasive.

13

2.  Whether the Indictment Alleges Facts to Support that Liang was an "Agent" of the PRC

Liang also argues that the Indictment is devoid of facts suggesting he was "being paid or compensated in any way" or that he had an "explicit agreement" with the PRC. Def. Mem. ISO Mot. to Dismiss 18 [Doc. No. 59]. As a threshold issue, "attempt[s] to sink a facially valid indictment with a motion to dismiss that targets the strength of the government's *evidence* misfire[]." United States v. Guerrier, 669 F.3d 1, 3 (1st Cir. 2011) (emphasis in original). Regardless, Section 951 does not contain any requirement that the government prove compensation or an explicit agreement between the individual and the foreign government in order to establish that the individual was operating under the direction or control of the foreign government. Indeed, the common-law understanding of a principal-agent relationship would caution against requiring that sort of evidence. See United States v. Rafiekan, 991 F.3d 529, 539 (4th Cir. 2021) ("Section 951's definition at least resonates with the common law's in important respects.").

And in any event, the Indictment sufficiently alleges facts that could support a finding that Liang "agree[d] to operate subject to the direction or control of a foreign government." It lays out numerous instances, over the course of several years, in which Liang met or communicated with PRC officials and took actions following those conversations. Liang informed an associate that the PRC Consulate "wanted something done" about the flag destruction in Chinatown; subsequently, Liang sent a PRC Official information on the alleged perpetrator; when PRC officials asked Liang for the names and titles of various Chinese community organizations and members, Liang provided them; after Liang met with PRC officials in the Taiwan Affairs Office, he organized a reunification community group in Boston

and, as Vice President of that group, attended counter-protests and gathered information on pro-democracy Hong Kong protestors. These allegations are sufficient to survive Liang's challenge.

    C.    *First Amendment Violation*

Liang argues that the Section 951 charge penalizes him for "communicating . . . with PRC officials" and therefore violates his First Amendment rights to free speech. Def. Mem. ISO Mot. to Dismiss 15 [Doc. No. 59].[3] The court reads Liang's argument as an as-applied, rather than facial, challenge to the statute's constitutionality. Cf. Showtime Entertainment, LLC v. Town of Mendon, 769 F.3d 61, 70 (1st Cir. 2014) (challenge is facial where "the claim and the relief that would follow . . . reach beyond the particular circumstances of these plaintiffs") (quoting John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010)).[4]

To start, the court disagrees with Liang's characterization of the Indictment's allegations: his alleged crime is not "merely" communicating with PRC officials, but rather undertaking specific actions (e.g., taking photos of and gathering information on Chinese community

---

[3] The government contends that the allegations regarding Liang's communications with PRC officials and other individuals are not themselves criminal acts, but rather "pertain to issues of motive and intent." Gov't Oppn. 13 (quoting Dumiesi, 424 F.3d at 579) [Doc. No. 60]. Where the government has not yet made its case, the court considers the possible First Amendment ramifications of the Indictment's speech-related allegations from multiple angles.

However, insofar as Section 951 restricts speech that is inherent to a defendant's criminal conduct, it survives a First Amendment challenge. See Packingham v. North Carolina, 582 U.S. 98, 107 (2017) ("Specific criminal acts are not protected speech even if speech is the means for their commission."); see also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949) (where the restricted speech is itself an "integral part of conduct in violation of a valid criminal statute," the Supreme Court has "reject[ed] the contention" that the First Amendment immunizes it).

[4] A facial First Amendment challenge to Section 951 would fail. The statute regulates conduct, not speech, and so there exists a "set of circumstances . . . under which [the law] would be valid," see United States v. Salerno, 481 U.S. 739, 745 (1987)—namely, circumstances that do not involve speech at all. For the same reason, the statute is not lacking in any "plainly legitimate sweep" where it is intended to proscribe actions, not speech, see Washington v. Glucksberg, 521 U.S. 702, 740 n. 7 (1997).

15

members for the PRC). And where, as here, "'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." See United States v. O'Brien, 391 U.S. 367, 376 (1968). In such cases, "a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377; see also Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984) (time, place, or manner restrictions "are valid provided they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve an important government interest, and that they leave open ample channels for communication of the information").

But in addition, the Indictment would survive even if such other actions had not been alleged. Section 951 does not inherently criminalize pro-foreign government sentiment or regulate in any way the content of any speech or expressive act. Nor does the statute belong to the second category of laws which, although facially content neutral, cannot be "justified without reference to the content of the regulated speech," or were adopted by the government "because of disagreement with the message [the speech] conveys." March v. Mills, 867 F.3d 46, 54 (1st Cir. 2017) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)). Instead, the dividing line between lawful and unlawful speech under Section 951 has to do with the relationship between the speaker and a foreign government, and whether, if the speaker is an agent of that foreign government, the speaker has notified the Attorney General of that relationship. Neither of those factors turns on the content of the speech itself. As a result, Section 951 is subject to

16

intermediate scrutiny, which requires that "the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" See Packingham, 582 U.S. at 106.

By enforcing a system to keep track of foreign agents working domestically, Section 951 furthers an undisputedly important governmental interest—that of national security. See, e.g., Haig v. Agee, 453 U.S. 280, 305 (1981). And Section 951's purported restriction on speech is avoidable—if an individual notifies the Attorney General prior to acting as an agent of a foreign government, then Section 951 carries no penalty for any speech in which that individual might subsequently engage. Finally, Section 951 leaves open ample channels of information between U.S. citizens and representatives of foreign governments. The statute does not prohibit U.S. (or foreign) citizens from communicating with embassies or from communicating with each other. Any incidental restriction on speech is therefore "no greater than is essential" to protect the government's national security interest. As a result, Section 951 satisfies the criteria for a reasonable restriction on the manner of speech.

### IV.   Conclusion

For the foregoing reasons, Liang's Motion to Dismiss [Doc. No. 58] is DENIED.

IT IS SO ORDERED.

July 16, 2024                               /s/     Indira Talwani
                                            United States District Judge